The next matter on our calendar is United States v. Scott Tucker, held in tandem with Beverly Van Ness for Mr. Tucker. I am not planning on spending any time on the forfeiture appeal per se, because the common issue there with the merits appeal is whether a stay should have been granted because of the likelihood of success on the merits. That's the first issue. Aren't we talking about the merits of the appeal as well? Yes. So that's what I want to address. I notice that your co-counsel is from Overland Park, Kansas. How appropriate, because that's where this whole scheme was run from, right? Well, the service company. Just asking. Go on. Obviously, I can only discuss one error at a time, and there have been many that have been raised. I just want to ask you something at the outset. You say that you are going to focus on the merits appeal rather than the forfeiture, but your main arguments with respect to the forfeiture relate to what I think are strong arguments that you make about the willfulness charge in connection with the RICO claim related to New York usurious lending. But there are other convictions that supported the forfeiture, so that if we were to overturn the RICO conviction with respect to usurious lending, that wouldn't invalidate the forfeiture. The fraud charge was based on fraud with respect to the terms of the loan and fraud with respect to the identity of the lender, and it has nothing to do with the arguments that you make about the willfulness charge on RICO usurious lending. Well, Your Honor, with respect to the wire fraud counts, the willfulness charge on Rack Tearing essentially directed a guilty verdict on those counts, so the jury went into deliberations on the wire fraud, which were the next— Directed a guilty verdict on the RICO usury counts, but not on the wire fraud. Yes. But that guilty finding, I would argue, necessarily carried over into wire fraud. Why did it necessarily carry over into wire? The elements of wire fraud are completely different, and they don't depend on knowledge of the unlawfulness of the loans in New York. Well, they broadly deal with an intent to deceive and a lack of good faith. The government had to prove a lack of good faith with respect to wire fraud, and the wire fraud counts had two theories, one of which was the true cost of the loans, misrepresentations about that, and the other was misrepresentations about the identity of the lender. Now, I want to jump ahead a little to another very serious error that we allege, which is the special interrogatory that the judge gave the jury, and that is solely related to the identity of the lender, and that is a critical element of the wire fraud. Who was the lender? I mean, who did the jury find was the lender? They found that Scott was the lender, based on this very pro-government list of factors that was an exclusive list the jury was asked to consider, and that was completely unnecessary to the elements of any of the charged crimes. The judge wouldn't even really explain why he wanted it, but that finding by the jury, and they were told about the factors and how they had to look at that question on the verdict sheet during the instructions by the judge, so it was in their minds when they deliberated on the substantive counts, and I think that that certainly affected the jury's opinion about the identity of the lender, because they found that Scott Tucker was, ergo, he knew he was, because of all these factors the judge listed, which were basically, they were from the government's indictment, and so they couldn't help but find that he knew that he was the lender and the tribes weren't, and therefore he had no good faith defense, and he acted willfully with respect to the wire fraud. Does that answer your Honor's question? Well, if that's the best you got. Well, I think with the sense that even if we were to overturn the RICO counts one through four, that would not give a reason to overturn the fraud counts and would not give a reason to stay the forfeiture. But the whole trial was really about who the lender was, and the defendant's alleged knowledge and belief that the Indian tribes were just an ornament in order to evade the state usury laws. That was the whole prosecution, and so I don't think you can look at this one charge, the error that I think is very strong, in order to decide the prejudice of that error and all the other errors that we alleged, which went to the central issue of the core of the defense. The defense was denigrated, and in fact it was essentially the judge gave a directed verdict with respect to the defense, both with respect to the willfully charge, and willfully was an element of . . . The evidence that your clients were essentially running a scam seems to me, based on the record as I've studied it, overwhelming. Well, Your Honor, I would point out, I think I've done as much as I can do. There's a lot of writing in this case, as I'm sure you're painfully aware, but there was a lot of evidence that was relevant to the defendant's good faith belief that this was a tribal operation, and it depended on advice of counsel that Mr. Tucker had received, the research that Mr. Muir independently did. A tribal operation wouldn't be an authorization to deceive borrowers about the terms and the costs of the loan. Well, that's a separate theory of the wire fraud, and whether there was a sufficient disclosure in the TILA form as to what the cost of the loan was, but I point out that that was a contested issue. The renewal feature was in the disclosure form right under the box. It was right there. It's at the government's special appendix, page 226. The terms of the automatic renewals are right there. They also, the government only called a handful of borrowers. There were hundreds of thousands, I would suspect, of loans in the country, and there was less than a 1% complaint rate. So they called a handful of borrowers who said they were confused, but I don't think that it was a slam dunk for the government that the defendants intentionally misled the borrowers because of these loan terms, which were, in fact, disclosed on the form. So back to Judge Parker, your question on overwhelming evidence. Help me put some of these facts in perspective from the appellant's point of view. Whenever borrowers complained that their loans were unenforceable, they were excused. As I read the record, Tucker never disclosed the chart explaining the automatic renewal process. You got rafts and rafts of complaints from attorneys general, better business bureaus, and so forth about the operation. You gave these phony weather reports to make borrowers think that there were places where your clients were not. You audited your employees to say that their clients were located on tribal land. Those who didn't do that were discharged. You had customers send mail to tribal addresses, and then you directed the tribes to file affidavits, as I read them, materially misstating the role of the tribes in the business. You had bank accounts in the tribe's name. Tucker controlled them all, and he used them as his own personal banks for his Jets, his Aspen House, and it's on and on. So it seems to me, and please let me know if I'm missing something, that on the basis of this major scam is substantial. What am I missing? Well, that really depends on whether you subscribe to the tribal model of lending, which the defense attempted to convey to the jury, in which they were stymied in presenting by exclusion of evidence, including evidence by an expert, and the limitation of the tribal model of lending, which is what some of the attorney witnesses testified about, the defense witnesses, Mr. Cohen and Mr. Schulte, which is that if the tribes enact—if they create a tribal entity devoted to the lending, they enact tribal ordinances related to the lending, including tribal interest rates, and they have a connection with what the defense maintained was the service arm of the lending in Kansas by having someone on the loans or to get whatever information they wanted to. The fact that the tribal account, Mr. Tucker was given a power of attorney to control that account, but it could be revoked at any time, which in fact it was by the Miami tribe. So they had the ultimate control over the lending. They had no resources. Part of the expert's job was going to be to explain how tribal enterprises routinely connect with private capital to engage in commercial ventures that are not on tribal lands because, for example, in this case, the reservation had no ability to have internet access. They were all very remote. They didn't have any personnel that were able to service these loans. They made so much money. They could have built up there everything that they needed on tribal lands if it was a genuine tribal model. Well, Your Honor, you have to remember there was no law, and the government has cited no law, that said this was not a legitimate tribal model, and I'm not here to say that it was a legitimate tribal model. I don't know. The issue here is the defendant's state of mind, whether they acted willfully, whether they acted in or they lacked good faith for the wire fraud accounts with an intent to deceive. The issue is whether they believed that this tribal model, which Mr. Tucker had been advised about by lawyers and continued to consult and spend millions of dollars on legal fees throughout the charge conspiracy, consulting lawyers in part in reaction to the civil lawsuits that were filed and to the extent that the civil lawsuits raised concerns, then the consultation was there to try to address those concerns. So it was an ongoing, it was a novel model. There was no law saying it was impossible. There was no law saying you can't have a tribal enterprise that's not on the reservation entirely. There was nothing there. And so that's the central issue of the trial, is what do the defendants believe? And on that score, I think all of the issues that we have raised have an impact on the jury's understanding of that defense. And certainly with respect to the wire fraud accounts, because the identity of the lender was a theory of misrepresentation in the wire fraud. And if the defendants were able to present their defense and the jury was able to fairly consider it, there was a question as to whether they believed that the Indian tribes were sufficiently involved in the loans to make the loans tribal loans. Your time has expired. You may have noticed you've reserved three minutes for rebuttal. I think we have your argument. We'll hear from the government. Thank you, Your Honor. May it please the court. My name is Hagen Scotton. I'm an assistant. You can raise the podium a little bit. Does that work? Yeah. You can even raise the whole podium. Oh, maybe not. It's maybe at the highest point. Well, thank you anyway, Your Honor. I'm so. Yes, Your Honor. If this was a genuine Indian model, business model, would you have prosecuted it? I think that's very unlikely. Leaving aside the question of prosecutorial discretion that actual tribes trying to make money for their generally impoverished citizens is incredibly different than Tucker trying to become a billionaire. Even as a legal matter, there it might actually have been difficult to show willfulness. Here, the evidence was overwhelming. So the defendants are right in arguing that it may be illegal but not prosecutable if it was really run by Native Americans. I think or at least they might have been right back in 2004. You're telling me that the government would not have pursued if the Onondagas and Syracuse, New York opened a payday lending and did everything on their territory and charged the same interest rate that we have in this case? That wouldn't have been, you wouldn't have, well, the Northern District, but you wouldn't have prosecuted? You don't think so? I think what this court said in Otoe, Missouri, if Your Honor's hypothetical, the Onondaga are actually doing everything on the reservation. Right. That might actually be legal. Otoe, Missouri looks at a lot of factors that would control legality and if everything is happening on the reservation, there's a good chance not only is that not prosecutable, it's actually not a crime. You're not saying the sovereignty is coterminous with the geography, are you? So as this court laid out in Otoe, probably the principal factor is where, I think that's how this court summarized it. There's also a substantial element of who. You need actual tribal officials, tribal personnel to be not only controlling but also conducting the lending. But the Onondagas could advertise in Manhattan, couldn't they? I mean, they could put an ad in any newspaper or online and attract customers not from Onondaga County or the Onondaga. And still, as long as the deal was done on the lands, the bookkeeping, the letters, everything, they would not be prosecuted? Well, I can't make a call for the government as to... I know you can't promise, but you think it's unlikely. All I can say is that the facts there are extremely different than the facts here. I understand. So this case doesn't tell you much about that. I understand. Your answers with respect to fraud, are you saying that if the Indian tribes were making loans on the reservation with fraudulent concealment and fraud with respect to the representation of the terms, that aspect would not be prosecuted? No, absolutely not, Your Honor. I took Judge Pooler's question, and maybe I misheard it, to be solely about the unlawful debt question. There's no dispute, never has been, that there's no tribal sovereign immunity claims like wire fraud and Truth in Lending Act. Fraudulent aspects were in no way... The answers that you gave to Judge Pooler, they had nothing to do with the fraud counts in this case. That is exactly correct, Your Honor. Even starting with the question of unlawful debt, I want to start with this idea of the tribal model, and then I do want to come to the instructions, since Judge Lavalle, you said that's a concern. I think an important point on this idea of a tribal model is forgetting what the actual law is, looking only at the legal advice the defendants received. And they had four attorneys testify, really. They had three appear on the stand, and then they entered into evidence this lengthy legal opinion letter that Tucker sought from another firm. Amir, in fact, was an attorney.  At no point did the government suggest that this legal concept of a tribal model is a fraud or a sham, that the legal theory is invalid or so crazy the defendants couldn't believe it. The proof was that it was a factual sham. That is, whatever the legal theory is, what you did looked nothing like it. And I think Judge Parker enumerated a lot of those reasons. But I should note one more. This was extremely easy to do because both Cohen and Schulte, two of the attorneys who testified for the defendant, had told Tucker that what he was doing was not entirely consistent with their opinions. And so when they testified, we were able to walk through their advice and look at the things these attorneys had told the defendants were important, like location of the activity, tribal control, and this phrase that kept coming up that the tribe could not be a mere conduit for the defendant's loans, and then say, the defendants didn't just lie about facts. They lied about the precise facts that they were told determined the legality of their conduct. And in fact, two of their attorneys had told them, your conduct here is not matching up with my advice. So I do think Judge Parker is correct that the evidence of willfulness here was absolutely overwhelming because where you're lying about the facts you know are material to your legality, you're showing willfulness. It all goes to their state of mind, doesn't it? As counsel said, this was all about their state of mind. But if they were lying about the underlying facts, that goes to their state of mind, doesn't it? Exactly, Your Honor. I'm sorry. Go ahead. No, you go now. I'm done. Yes, Your Honor. There are a couple of iterations of the charge on willfulness, but in one of them, Judge Costell said in effect that willfulness can be shown by the defendant's knowledge of the interest rate. That is correct. Yes. It's not an iteration. Why was that proper? Why wasn't that, in effect, directing a verdict? Because everyone knew what the interest rate was. That was defined to a single element of these counts. And I think, Your Honor, we'd need to look at a little bit more than what was excerpted in the appendix. If you start, I believe it's at page 3292 of the actual transcript, you can see that what Judge Costell is describing is element six of count two. And on the specific question, the specific question... Was that count one or count two? Count one, I'm sorry, Your Honor. Count one, element six. On the specific question of unlawful debt, as in, do the defendants know they're charging more interest than the state laws allow, the district court was absolutely right to instruct as in Biasucci. That is one of the things we had to prove. If we can't prove willfully charging more than the state laws allow, we don't have anywhere to go from there. But there's no reason to think that that instruction specifically on that element somehow subsumed his general willfulness instruction. That he had given earlier. That he had given earlier and that he referred back to later. And that he referred back to as he went through these, went through the various counts later on. Correct, Your Honor. And a couple... Confusing, isn't it? I think it was much less confusing for a jury that had sat through a five-week trial and four hours of legal argument in which the lawyers were telling the jury the whole time, look, the whole issue here is did the defendants know they were acting illegally? You can see that in our summation. You can see that in the defense summations and the course of trial. Having heard all that, when Judge Castell gets up in the first definition, really the only definition he gives of willfully, he says willfully means the defendant must be aware of the generally unlawful nature of his acts. The jury knew immediately. Of course it does. That's what we've been talking about for the last five weeks. Another reason that was confirmed... But then the court says that willfulness is satisfied if they knew the interest rate they were charging. Well, he says willfulness on this particular element. And I don't think it's that uncommon, although it may impair clarity in some sense, for federal statutes to have different levels of mens rea or different ways of proving mens rea for different elements. Interstate commerce, you seldom need any mens rea at all. Some things only need to be reasonably foreseeable, such as use of the wires. But you still have to have specific intent to defraud if you want to prove a wire fraud count. And another reason, I think, Your Honor, that the jury would have been particularly clear here... I'm talking about the RICO count, the counts one through four. Absolutely, Your Honor. I was just using wire fraud as an example where different elements can have different mens reas, and we do assume juries can figure that out. And I think a particularly clear reason the jury here would have known this, in addition to what I've already discussed, is immediately after these instructions on the unlawful debt counts willfulness, where the judge starts and ends by referring back to the correct definition of willfulness. He talks about the advice of counsel defense. And I think you can see this most clearly on pages 3300 to 3301 of your transcript. If I can take a second, Your Honor, I actually want to get it out. And this is a mere four pages after these contested instructions end. And he says, in order, when you're looking at Tucker, you need to consider advice of counsel on the issue of willfulness. And actually, in the appendix, the page I'm going to read from is 272. The advice starts on 271, says you need to consider advice of counsel on willfulness. It continues on to 272. And this is what Judge Castell says. In short, you should consider whether, in seeking and obtaining advice from lawyers, Mr. Tucker intended— Where were you on 3300? Where were you? I'm now on 3301, Your Honor, first paragraph, a little towards the bottom. On the other hand— Sorry, Your Honor? 3301 says on the line 14, on the other hand— Correct. So I'm just above that. I'm starting on line 8. On line what, I'm sorry? 8. Beginning— Yes, I have it. And I'm just sort of picking up the first full sentence, beginning in short. In short, you should consider whether, in seeking and obtaining advice from lawyers, Mr. Tucker intended for his acts to be lawful. If he did so, a defendant cannot be convicted of a crime that requires willful and unlawful intent. So I think a jury hearing that has just been reaffirmed that willfulness means the opposite of trying to behave lawfully. It leaves no doubt in any reasonable juror's mind that what the district court is saying is, to convict him of the counts as a whole, you must find he was aware of the generally unlawful nature of his acts. I see that I'm— Are you having argument time with your colleague? I am, Your Honor, although Mr. Robbie is only going to discuss the If the court has any further merits questions, I'd be happy to address them. No, we'd like to hear on the forfeiture as well. Good morning, Your Honors. May it please the court, my name is Sagar Ravi, and I'm an AUSA in the Southern District. I'm here to address the non-merits aspects of the forfeiture. There's a few points I want to emphasize to this court. The first is what Judge LaValle already recognized was that on the merits, Mr. Tucker has failed to identify any issues that he's likely to succeed on that would go to the fraud and money laundering counts here, which I don't think it's in dispute, provide an independent basis for the forfeiture here. And Judge Castell certainly did not abuse the discretion in denying the state of forfeiture on that basis alone. There are, however, other factors. There was one problem with respect to the money laundering count that the judge on the money laundering count at one point repeated the problematic instruction on willfulness that was given in connection with the RICO usury count. What about that? Your Honor, on the willfulness instruction with respect to the money laundering count, again, I think we reiterate that we believe that the willfulness instruction given at the beginning of the count was proper and legal and appropriate, and it was a reference that was made to it. Because even if all the usury and RICO usury and money laundering counts were stricken, you'd still have the wire fraud counts to sustain the forfeiture. That is correct, Your Honor. Now, turning to some of the other factors that Judge Castell considered under the case of United States v. Silver, why this matters is also the high cost of maintaining this property if a stay was granted. There are 4.5 million victims of Tucker's fraud in this case, and the government, due to the complexities in seeking to make those victims whole, there was no restitution in this case. Rather, the government applied to have the forfeiture directed to victims through a remission process, which has continued to date. As the government provided in its brief, the cost of simply maintaining the Aspen vacation home cost the government $100,000 a year. The cost of maintaining these luxury cars, which do require significant maintenance, including Porsches and Ferraris, do also incur significant costs. Those are all costs which, if a stay had been granted, would continue to be incurred and would take away from money that could be given to the victims. Indeed, with respect to the Aspen vacation home, because the stay was not granted, the government has been able to put that on sale, and there's currently an offer that has been accepted, and there's potential closing that's going to happen. Would a stay be granted now, it would then put that wholesale process delayed again for several months, if not longer, until there's another appropriate time to put the house on market. For those reasons, Your Honor, the government submits that. Judge Castell did not err in denying the stay a forfeiture, again, on the record before him at the time, which was very sparse as to any factors that weigh in favor of a stay. Thank you, Counsel. Thank you. Ms. Van Ness, you have three minutes. I have so much to say. Let me do a couple of things. Let me ask you this about the willfulness point that you make. In U.S. v. Biascusi, the court charged the jury that the defendants could be found guilty either by proving specific knowledge of the interest rates on the usurious loans or by showing their charge, the either or, which it seems to me to be precisely the point you're raising. Help me out here. I've addressed the Biascusi case in depth in my reply brief on page seven and eight. The court there, the defendants there were, as I remember it, not the actual loan sharks, but they were people who had funded the operation. Their defense was they didn't know that the rates were so high. They wanted that charge. The court gave the either or instruction. When this court reviewed that either or instruction, it specifically said that it was not required for the defendants to know the interest rates charged and that the knowledge of the generally unlawful nature of the acts was necessary. That was sufficient to support the conviction. It also was dealing solely with New York law, which has a criminal usury statute that has the mens rea of knowingly. The court there gave a knowingly and willfully charge that conjoined the two elements. We are focusing solely on the willfully charge, which the judge agreed to give in terms of all the willfulness instructions and for all the counts, that you had to be generally aware of the unlawful nature of your conduct. I think the Biascusi case is really an anomaly. We clearly recognize it, but I think the facts are different. The focus of the defendants in that case were different. The focus of the judge in fashioning the charge was different. What comes out loud and clear from this court's opinion is that the main mens rea for an unlawful debt prosecution under RICO is that the defendants willfully engaged in the conduct, namely they were generally aware of their unlawful nature of their acts. After the judge gave this charge, can you remind me what specifically you took exception to? Oh, my goodness. I have made a list. I know there was colloquy about this at an earlier point in the trial. Yes, and I specifically objected to the conjoining of the charges. At the very least, I asked the judge . . . This is after the charge? No, this was at the charge conference, an objection to the charge. I think it was said that we rely on all of our exceptions down the road, but this was litigated endlessly below. Judge Porker's question was, what did you take exception to after? I'd particularly be interested in knowing whether you took exception to the willfully charge about that willfulness is satisfied by knowing the interest rate. Your Honor, I believe there was a filing in which we accepted to instructions going into the case. Filing? What? Filing, you said? Yes, there was a lot, and it's all in the appendix, but there was a lot of written litigation on requests to charge and objections to charge and compromised requests. The question we're focusing on is when the judge had completed the charge and had the opportunity at that time to correct anything that was improper in the charge, the rule generally requires counsel to call the judge's attention by an exception to things that the counsel would like to have changed and corrected so that the judge can clean up any mess that was made. Well, I will look back at the record and file something in addition if there was such a letter, but I think the possibility that the judge would retract this charge after he gave it were less than zero because it had been heavily litigated and he refused to do so, including refusing to break out knowingly, which is knowledge of the interest from willfully. He refused to do that. Well, were any exceptions taken after the charge and before the jury retired? I don't remember. I was not trial counsel. I don't . . . I'll have to look back at the record, Your Honor. If the government is contending that the part of the willfulness charge that you particularly object to and which seems to have the most really related only to an aspect of willfulness and not to general willfulness, and that's something that certainly if it didn't . . . if the judge did not mean that willfulness is satisfied by knowledge of the interest rate, that is certainly something that could have been cleaned up by an exception after the charge. Are you saying that the judge had made absolutely clear that that was what he intended and would not . . . Absolutely, Your Honor. He made it absolutely clear. I also want to go back, if I may, to the fraud here. The wire fraud had everything to do with the identity of the lender, who was the true lender, whether the defendants believed that Mr. Tucker or his service company was the lender and was just lying and intending to deceive. The identity of the lender question, I will go back to the special interrogatory, which we haven't really discussed. I've brought it up, but I urge you to look at that section of the brief because I think that that interrogatory directed the jury to find that Mr. Tucker was in fact the lender based on the evidence. What's wrong with the interrogatory? It seems to me that it's quite helpful. To who, Your Honor? To the jury, to the judge. They didn't need to decide who was the true lender. They were charged with deciding whether the defendants believed that the tribal model was sufficient to make the tribes the lender. There was nothing in any of the elements of any of the charge crimes about the identity of the lender. That was not an element. This was a major issue that was contested at the trial. Who's lending this money? Is it the tribe or is it Tucker and Muir? But it was not a relevant question for guilt. It was not charged in connection with any of the substantive instructions given on the counts. It was at the Excuse me? Wasn't it one of the aspects of the fraud? The identity of the lender, that there were misrepresentations made about the identity of the lender, was a theory of the fraud. So how can you say that it was not relevant to anything if it was an element of the fraud? A part of the way in which the loan was fraudulent was by misrepresenting the identity of the lender. Yes, and that question for the jury was a question of fact based on the evidence. It was heard and was not allowed to hear about the defendant's belief about who was the lender, not who was the lender. We are not asking, we didn't ask the judge, Tucker didn't ask the judge to decide whether the tribe was in fact, as a matter of law in fact, the true lender or whether Tucker was. Our defense was they had a good faith belief that the tribal model as it was set up on advice of counsel was sufficient. It's 2019 now and there's been a lot of case law concerning Indians and the gaming law and the bingo parlors and all of that stuff. But during the course of this charged conspiracy, there was no law that criticized this kind of model or set forth what was required in order for a tribal model to be sufficiently related to a tribe to... There was no litigation involving a scam of this scope. Well, that begs the question with all due respect, Your Honor, whether it was a scam. Because if you look at it from the lens of the state of mind, there certainly was evidence that the jury could find that they didn't believe that the tribes were lender, but there was a lot of evidence from which they could have found that they did. And that included the advice of counsel from Mr. Cohen, who I will just tell you on page 26 of my opening brief, he never said to Mr. Tucker, you're in trouble. He endorsed this model and said that you could strengthen it if you did some more stuff, but this is fine. Mr. Schulte, who was an expert in Indian law, also endorsed this model and he advised Mr. Tucker throughout the entire course of the conspiracy, but we weren't allowed to present a lot of that evidence because we were cabined into the period during which the model was conceived. And so there was a lot of... We haven't even gotten into the limitation on evidence that we complain about, but there's a lot of evidence that could rebut some of this evidence you're talking about if we'd been allowed to present it, but we weren't. And one final question on your weather report. I just want to remind you that the weather report idea came from a cooperating witness who... She wasn't cooperating then, but that was her idea. She was a manager and she not only thought of it, she never told Mr. Tucker or Mr. Muir that that's what they were doing. Okay? Conclusion. Thank you. Thank you both very much. Lively argument. We'll reserve decision.